HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ANNA REAM,

    Plaintiff,

v.

UNITED STATES OF AMERICA,

    Defendant.

Case No. 17-1141-RAJ

FINDINGS OF FACT AND
CONCLUSIONS OF LAW
FOLLOWING BENCH TRIAL

## I. INTRODUCTION

Plaintiff Anna Ream filed a complaint against Defendant United States of America ("the government") pursuant to the Federal Tort Claims Act ("FTCA"). Dkt. # 1. The Court heard this matter in a bench trial that began on July 1, 2019 and concluded on July 8, 2019. Following cross-motions for summary judgment, the only issues remaining for trial were causation and damages. *See* Dkt. # 37. The trial included the testimony of several lay and expert witnesses and the admission of various exhibits into evidence. The parties also submitted proposed findings of fact and conclusions of law. Dkt. ## 65, 66.

This matter now comes before the Court following the presentation of evidence. The Court has considered the evidence, particularly including careful attention to the testimony of witnesses. The Court, in weighing the testimony of the witnesses, has considered: (1) the witnesses' intelligence; (2) the witnesses' memory; (3) the witnesses' abilities and opportunities to see, hear, or know the things that they testified about; (4) the

ORDER – 1

witnesses' manner while testifying; (5) any interest, bias, or prejudice the witnesses may have; and (6) the reasonableness of the witnesses' testimony when considered in light of all the evidence in the case. *See* Fed. Civ. Jury Instr. 9th Cir. § 1.14 (2017). The Court has further considered the written arguments submitted by counsel for the parties and the authority cited therein.

Pursuant to Federal Rule of Civil Procedure 52, the Court enters the following findings of fact and conclusions of law, which are based upon consideration of all the admissible evidence and this Court's own assessment of the credibility of the trial witnesses. To the extent, if any, that Findings of Fact, as stated, may be considered Conclusions of Law, they shall be deemed Conclusions of Law. Similarly, to the extent, if any, that Conclusions of Law, as stated may be considered Findings of Fact, they shall be deemed Findings of Fact.

## II. FINDINGS OF FACT

### A. Accident on August 10, 2013

1. At approximately 7:55 a.m. on August 10, 2013, a three-vehicle military convoy left Joint Base Lewis-McChord (JBLM) for the Yakima Training Center. Dkt. # 34. The convoy consisted of two Heavy Expanded Mobility Tactical Trucks (HEMTTs) and one M1083 LMTV towing a generator. *Id*. Sergeant (SGT) Sean Reeves was the convoy's Master Driver and the truck commander for the lead HEMTT. *Id*. Specialist (SPC) Sean Reeves drove the LMTV and Private Second Class (PV2) Ishayaa Muhammad served as the LMTV's truck commander. *Id*. The convoy's military orders placed SPC Reeves' LMTV between the two HEMTTs. *Id*.

2. The convoy route traveled north on Interstate 5 to State Route (SR) 18 and then east on SR 18 to Interstate 90. *Id*. Traffic along the route was moderate which allowed the convoy to maintain a speed of approximately 55 mph. *Id*. The weather was clear and the road surface was dry. *Id*. The

ORDER – 2

1  convoy traveled north on Interstate 5 and merged onto SR 18.  This section of SR 18 consists of two lanes in each direction separated by a median.  *Id*.

3. As the convoy crested a rise in the roadway, the passengers in the convoy's lead vehicle saw a pickup truck towing a horse trailer stopped in the right travel lane approximately 100 meters ahead with a female standing in the roadway waving her arms at the oncoming vehicles. Dkt. # 64 at 62:22-63:1.

4. The lead HEMTT came to a sudden stop about ten feet from the female and the horse trailer.  *Id*. at 63:2-4.  Plaintiff, who was directly behind the lead HEMTT, slammed her vehicle's brakes and came to a stop less than two feet from the back of the lead HEMTT.  *Id*. at 63:4-6.  SPC Reeves applied the brakes on the LMTV directly behind Plaintiff but he struck the right rear corner of her trailer.

**B.  Post-Accident Treatment**

5. Plaintiff departed the scene in the tractor and drove to Multicare Auburn Medical Center in Auburn, Washington, where she complained of neck and low back pain. Trial Exhibit 56.  She was asymptomatic with regard to her lumbar spine prior to the trauma before the collision.  Dkt. # 62 at 87:15-18.  X-rays of her lumbar spine showed no acute abnormality.  Trial Exhibit 56.  She was given prescriptions for Flexeril and Tramadol and discharged.  *Id*.

6. She drove herself back to her home in Las Vegas and sought treatment August 15, 2013.  She was assessed with lumbar strain, cervical strain, chest wall contusion, knee contusion and lumbar radiculopathy.  *Id*. at p. 3.

7. She was referred to physiatry and physical therapy given her lack of progress with pain management over nine days since the accident.  Trial Exhibit 56 at pp. 5-6.  X-rays of her cervical spine, left ribs, chest, and left

ORDER – 3

knee showed no abnormalities. *Id.* at pp. 12-15. Plaintiff was then referred for an MRI of her lumbar spine. *Id.* at p. 11.

8. Plaintiff had two MRIs of her lumbar spine, on September 1, 2013 and September 3, 2013. Trial Exhibits 218-219; 238-239. Findings on the MRI of September 3, 2013 provided: "Degenerative disk change at L5-S1. Central disk protrusion without any significant mass effect at that level. Borderline bilateral foraminal encroachment at L4-5 and L5-S1." Trial Exhibit 239.

9. Plaintiff was referred to Dr. Jason Garber in late September 2013. Trial Exhibit 73; Dkt. # 45 at 16:13-16. Dr. Garber ordered an electromyogram (EMG) study; plain film x-rays, and physical therapy. *Id.* at 29:19-21.

10. Plaintiff began physical therapy at Matt Smith Physical Therapy on October 3, 2013. Trial Exhibit 224. Physical therapists noted their opinion of inconsistencies in Plaintiff's complaints of pain. Trial Ex. 232.

11. Plaintiff underwent the EMG study on October 17, 2013, which showed no evidence of lumbar radiculopathy or peripheral neuropathy. Dkt. # 61 at 118:24-119:1. Plaintiff then underwent an x-ray of the lumbar spine on November 13, 2013, which showed no evidence of an osseous abnormality, but moderate to severe degeneration at L5-S1. Trial Exhibits 240; 246.

12. On December 16, 2013, Plaintiff had an epidural steroid injection by Dr. Alain Coppel but reported no significant relief. Trial Exhibit 69.

13. Plaintiff had a provocative lumbar discogram on May 12, 2014. Trial Exhibit 70. Dr. Coppel indicated his interpretation that the discogram showed concordant pain at L4-L5 and L5-S1, but no evidence of pain at L3-4. Trial Exhibit 59 at p. 25; Dkt. # 45 at 39:13-25.

14. Plaintiff also underwent a post-discography CAT scan on May 12, 2014, which showed evidence of fissures on at L3-4, 4-5, and 5-1. *Id.* In Dr.

ORDER – 4

Garber's opinion, there was evidence of internally disruptive discs at L4-5 and L5-SI, disc herniation, and pathology at those discs. *Id.* at 42:1-7.

15. Following Plaintiff's discogram, Dr. Garber recommended a two-level transforaminal lumbar interbody fusion surgery at L4-L5 and L5-S1. Dkt. # 61 at 51:4-9; Dkt. # 45 at 42:12-13. Plaintiff also saw Dr. Flangas who agreed with Garber's recommendation. Trial Exhibit 48.

16. In September 2014, Plaintiff underwent the fusion surgery. Dkt. # 61 at 51:3-4. After additional physical therapy and time spent on pain management, Plaintiff reported no relief. Dkt. # 62 at 95:5-9.

17. Dr. Garber released Plaintiff to return to light-to-sedentary capacity work on February 24, 2015 with certain conditions: "No bending at the waist, no lifting greater than 10 to 15 pounds, and alternate sitting, standing and walking." Dkt. # 45 at 49:15-18. However, Plaintiff has not returned to worked since being cleared and continued to report consistent pain. Dkt. # 62 at 98:24-25.

18. In early 2016, Plaintiff underwent a spinal cord stimulator trial to address her continued pain complaints. *Id.* at 96:10-11. She eventually came under the care of Dr. Jorg Rosler. Plaintiff experienced some pain relief using the spinal cord stimulator. Dkt. # 61 at 53:5-10. Rosler believed that Plaintiff might be a candidate for an implantable spinal cord stimulator. [Id.]

19. In connection with Dr. Rosler's recommendation for an implantable spinal cord stimulator, Plaintiff underwent a pre-surgical psychological assessment. Dkt. # 42 at 11:8-23-25. She was diagnosed with Somatoform Symptom Disorder, a clinical diagnosis from the Diagnostic and Statistical Manual, Fifth Edition, indicating her pain complaints were likely exaggerated and out of proportion to her symptoms. *Id*. at 20:8-21:3; Trial

ORDER – 5

| | |
|---|---|
| 1 | Exhibit 221. Plaintiff ultimately elected not to pursue that treatment, |
| 2 | claiming that the stimulator was shocking her. Dkt. # 62 at 97:9-16. |

20. In 2018, Plaintiff visited Dr. Paul Schwaegler. Dkt. # 61 at 53:21-24; Trial Exhibit 63. Dr. Schwaegler was concerned that Plaintiff's fusion surgery might not have consolidated. *See* Dkt. # 61 at 83:20-23. He also recommended possible revision surgery consisting of an anterior/posterior approach if it was determined that Plaintiff had pseudoarthrosis. *See* Dkt. # 61 at 96:21-97-10.

21. Dr. Virtaj Singh conducted a medical examination of Plaintiff on May 18, 2018. Trial Exhibit 205; Dkt. # 63 at 48:4-8. While he agreed that the failed fusion required revision, he did not believe that the failed fusion was the source of her ongoing and unchanged pain complaints. *Id.* at 76:13-16. He further opined that Plaintiff's subjective pain complaints were likely the result of central sensitization, and psychosocial factors including somatization disorder, a high disability conviction, deconditioning and opioid-induced hyperalgesia. *Id.* at 59:8-59:19; 67:12-15.

22. He also concluded that Plaintiff was capable of work in the light-to-sedentary range would benefit from a pain management program to address her pain complaints. *Id.* at 110:9-16, 112:4-5.

23. In 2019, Dr. William Smith reviewed Plaintiff's CT scans and determined that she had pseudoarthrosis at both L4-5 and L5-S1, with broken hardware screws at L4 and L5, and adjacent segment disease with significant facet arthropathy secondary to screw impingement at the L3-4 region. Trial Exhibit 71. Dr. Smith thought Plaintiff was a surgical candidate. *Id.*

24. Plaintiff's revision surgery is approximately $500,000 for the anterior procedure. Dkt. # 61 at 89:8-9. Dr. Schwagler, who will be performing the

ORDER – 6

surgery believes Plaintiff could potentially be cleared for work one year from the revision surgery. *Id*. at 133:21-24.

### III. CONCLUSIONS OF LAW

**A.     Liability**

1. Plaintiff brought this case pursuant to the Federal Tort Claims Act ("FTCA"). This court has jurisdiction pursuant to 28 U.S.C. § 1346(b)(1).
2. Venue is proper in the Western District of Washington pursuant to 28 U.S.C. § 1402 because the acts and omissions complained of occurred in this district.
3. Pursuant to the FTCA, the United States shall be liable for tort claims "for injury . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).
4. Because Plaintiff's injuries occurred in Washington State, the law to be applied in this case is the substantive law of Washington State. *Liebsack v. United States*, 731 F.3d 850, 855 (9th Cir. 2013).
5. Under Washington law, a party asserting a claim of negligence has the burden to prove, by a preponderance of the evidence, duty, breach, causation and damage. *Tolliver v. United States*, 957 F. Supp. 2d 1236, 1244 (W.D. Wash. 2012) (citing *Keller v. City of Spokane*, 44 P.3d 845 (Wash. 2002)).
6. By Order dated May 21, 2019, the Court granted Plaintiff's cross-motion for summary judgment and determined that the United States was negligent as a matter of law. Dkt. ## 20, 24.

ORDER – 7

**B.  Causation**

7.  Washington law requires Plaintiff to prove by a preponderance of the evidence that the United States' negligence was the cause in fact and the legal cause of her claimed damages. *Harris v. Groth*, 99 Wash.2d 438, 451 (1983).

8.  "Cause in fact" is "but for" causation, or the physical connection between an act and the resulting injury. *Christen v. Lee*, 113 Wash.2d 479, 507 (1989). Legal causation rests on policy considerations as to how far the consequences of defendant's acts should extend and involves a determination of "whether liability should attach as a matter of law given the existence of cause in fact." *Id.* at 508.

9.  The Court finds that it was more likely than not that Plaintiff developed symptomatic annular tears and herniated discs from the accident requiring medical care.[1]  Dkt. # 61 at 119:14-120:1.  The Court credits lay testimony that Plaintiff was asymptomatic before the accident and experienced neck and back pain immediately following the accident and has continued to experience persistent back pain since that time.  The September 2013 MRI identified an annular tear at L5-S1 and the May 2014 discography showed that there were annular tears that were symptomatic at both L4-5 and L5-S1.  *Id*. at 119:13-120:1.  Accordingly, the government's negligence was the cause in fact and the legal cause of Plaintiff's damages.

**C.  Injuries and Damages**

10. Plaintiff is presently 50 years old and has limited educational capacity. She did not complete high school or obtain a GED.  Plaintiff worked off-and-on in several low-skilled jobs before becoming a truck driver.  Prior to this

---

[1] The Court discredits the government's expert testimony that the forces sustained by Plaintiff's low back after being hit by a military vehicle were within the range or even below the force generated during every day, normal activities.  Dkt. # 64 at 105:22-25.

ORDER – 8

accident, Plaintiff was physically able to do her work without any disability.

### 1. Past Medical Expenses

11. Under Washington law, Plaintiff may recover only the reasonable value of medical services received, not the total of all bills paid, and must prove that the medical costs were reasonable. *Patterson v. Horton*, 84 Wash. App. 531, 543 (Div. 2, 1997). "[M]edical records and bills are relevant to prove past medical expenses only if supported by additional evidence that the treatment and the bills were both reasonable and necessary. *Id.* (citing *Nelson v. Fairfield*, 40 Wash.2d 496, 501 (1952); *Carr v. Martin*, 35 Wash.2d 753, 761 (1950); *Trudeau v. Snohomish Auto Freight Co.*, 1 Wash.2d 574, 585-86 (1939)).

12. The Court concludes from the preponderance of the evidence that the medical care provided to Plaintiff to date was reasonably necessary and causally related to the accident.

13. The government disputes whether the fusion surgery performed by Dr. Garber was reasonable and necessary. Based on the expert testimony of Dr. Schwagler, the Court finds that the evidence sufficiently demonstrates that the fusion surgery was reasonable and necessary to address low back pain causally linked to the accident. *See also* Dkt. # 63 at 86: 9-11, 88:16-19. Dr. Schwagler testified that, after conservative measures failed and the discography confirmed Plaintiff's symptomatic discs, surgery to decompress the nerves and get Plaintiff out of pain was reasonable and necessary. Dkt. # 61:7-8, 147:8-9.

14. The government also contends that discograms are controversial tests subject to high false positive results and thus did not provide a reasonable foundation for Dr. Garber to proceed with fusion surgery. The Court

ORDER – 9

acknowledges that lumbar discograms are somewhat controversial. Some orthopedists do not do discograms and do not find them to be sufficiently reliable. Others do discograms, but with varying criteria for when and under what circumstances the procedure should be done. Ultimately, the Court finds that the evidence sufficiently supported the use of discograms in 2014 as part of the overall clinical and diagnostic work-up prior to surgery.

15. Expert testimony from Jamie Gamez demonstrated that Plaintiff's reasonable medical costs totaled $375,729.95. Dkt. # 49 at 68:1-4.

16. However, some of Plaintiff's medical bills and costs were excluded or not offered into evidence, including bills and records relating to Plaintiff's bariatric surgery in March 2019. Trial Exhibits 12, 25, 36, 46, 47, and 64.

17. Thus, the Court finds a total of $362,983.29 in past reasonable medical costs.

### 2. Future Medical Services

18. Future consequences, diseases, or conditions, possibly resulting from existing injuries, are a compensable item of damages under Washington law. *See* RCW § 4.56.260. Mathematical exactness is not required because the need for future medical treatment raises a presumption that the plaintiff will incur related costs.

19. The preponderance of the evidence further supports a finding that the reasonable value of future medical care will be $521,000. Expert testimony sufficiently demonstrates that Plaintiff will require revision surgery to correct the fusion surgery ($500,000) and future pain management services ($21,000).

ORDER – 10

### 3. Lost Wages

20. Economic damages also include "loss of earnings" and "loss of business or employment opportunities." RCW § 4.56.250(1)(a).
21. The Court heard diverging testimony on Plaintiff's economic damages based primarily on different assumptions regarding Plaintiff's employment potential, both before and after the accident.
22. The Court credits the evidence demonstrating that Plaintiff's pre-injury earning capacity was consistent with the average earnings of a Nevada truck driver with a commercial driver's license, or approximately $43,000 per year. Dkt. # 62 at 26:15-23.
23. The Court finds that Plaintiff was unable to work from the time of the accident through June 2015 following Dr. Garber's release to return to work. Dkt. # 63 at 16: 9-17. Accordingly, the Court awards Plaintiff $86,965, in past wages.
24. Expert testimony further supports the conclusion that Plaintiff has "considerable dynamic loss" to her lumbar spine and functional limitations that will prevent her from doing long-haul trucking again. Even with a successful spinal surgery, her anterior lumbar would still result in limited dynamic functionality that will deteriorate over time. Dkt. # 61 at 159:14-23, 161:1-164:20, 177:5-11.
25. Dr. Christina Tapia, a member of both the American Economic Association and the American Academy of Economic and Financial Experts, testified that the present value of Plaintiff's future earnings as a truck driver amount to $568,362 to $792,881. Dkt. # 62 at 175:20-176:3. The totals are based on both the average work-life expectancy and the 75th percentile work-life expectancy for a woman with between zero and 12 years of education but less than a GED and high school diploma. *Id*. at 163:15-164:6.

ORDER – 11

26. However, the Court credits testimony from both Dr. Schwagler and Dr. Singh that Plaintiff should be able to return to work following the revision surgery as well as expert testimony demonstrating that Plaintiff should be able to obtain low-skilled, sedentary to light work within three months thereafter, earning approximately $17,160 annually. Dkt. # 64 at 12:1-15:8; Trial Exhibit 290.

27. Considering the reports of the economists, the Court determines that the sum of $333,800 will fairly compensate Plaintiff for loss of future earning capacity. *See also* Dkt. # 62 at 163:15-164:6, 175:20-176:3.

**4. Noneconomic Damages**

28. There are no "fixed standards by which to measure noneconomic damages." WPI 30.01.01. Noneconomic damages means subjective, nonmonetary losses, including, but not limited to pain, suffering, inconvenience, mental anguish, disability or disfigurement incurred by the injured party, emotional distress, loss of society and companionship, loss of consortium, injury to reputation and humiliation. RCW § 4.56.250(1)(b).

29. The Court finds that Plaintiff has experienced nonmonetary losses including, but not limited to, pain and suffering. Although there was some evidence of symptom magnification and exaggeration, the Court heard compelling testimony that following the accident Plaintiff needed assistance tying her shoes, putting on her clothes, bathing and going to the bathroom. Dkt. # 61 at 35:16-25. She also reported episodes where she lost control of her bowels. *Id* at 65:24-25. The Court awards damages for past pain, suffering and disability in the amount of $100,000.

30. The Court also heard testimony that Plaintiff will still experience pain following the revision surgery and will be unable to return to her previous occupation and way of life. She will continue to have functional limitations

ORDER – 12

that prevent her returning to her former employment as a truck driver or any type of manual labor. These limitations, which include no bending at the waist or lifting greater than 10 to 15 pounds, will impact her daily life. In addition, she has an increased risk of back injury following the revision surgery. The Court awards damages for future pain, suffering and disability in the amount of $50,000.

## IV. CONCLUSION

31. As a direct and proximate result of her injury, Plaintiff has incurred damages as follows:

Past Loss of Wages: $ 86,965

Future Loss of Wages: $ 333,800

Past and Future Medical Expenses: $ 883,983.29

Past Pain, Suffering, Disability: $ 100,000.

Future Pain, Suffering, Disability: $ 50,000

**Total Damages: 1,454,748.29**

The clerk shall enter judgment for Plaintiff.

DATED this 19th day of March, 2020.

The Honorable Richard A. Jones
United States District Judge

ORDER – 13